United States District Court
Middle District of Florida
Jacksonville Division

JACQUELIN SPIVEY-ADAMS,

     *Plaintiff,*

V.                                                   NO. 3:16-CV-1134-J-PDB

ACTING COMMISSIONER OF SOCIAL SECURITY,

     *Defendant.*

---

## Order Affirming Commissioner's Decision

This is a case under 42 U.S.C. §§ 405(g) and 1383(c)(3) to review a final decision of the Acting Commissioner of Social Security denying Jacquelyn Spivey-Adams's[1] claim for supplemental security income.[2] Spivey-Adams seeks reversal and remand based on the Administrative Law Judge's ("ALJ's") treatment of medical opinions of Dr. Anjan Parghi, Dr. Marisol Arcila, and Dr. Jawed Hussain. Doc. 15.[3] The period

---

[1]Spivey-Adams's first name is spelled "Jacquelin" in the complaint and on the docket. *See* Doc. 1. She appears to spell it "Jacquelyn." *See* Tr. 243.

[2]Spivey-Adams also filed a claim for disability insurance benefits. Tr. 188. She concedes substantial evidence supports the ALJ's finding that she was not disabled on or before her date last-insured and so does not challenge the ALJ's decision on that claim. *See* Doc. 15 at 2 n.1.

[3]The Social Security Administration uses an administrative review process a claimant ordinarily must follow to receive benefits or judicial review of a denial of benefits. *Bowen v. City of New York,* 476 U.S. 467, 471−72 (1986). A state agency acting under the Commissioner's authority makes an initial determination. 20 C.F.R. §§ 416.1400−416.1406. If dissatisfied with the initial determination, the claimant may ask for reconsideration. 20 C.F.R. §§ 416.1407−416.1418. If dissatisfied with the reconsideration determination, the claimant may ask for a hearing before an ALJ. 20 C.F.R. §§ 416.1429−416.1443. If dissatisfied with the ALJ's decision, the claimant may ask for review by the Appeals Council. 20 C.F.R.

under consideration is August 2012 to February 2015. *See* Doc. 15 at 2 n.1; Doc. 17 at 4.

## Background

Spivey-Adams was born in 1984. Tr. 188. She completed one year of college and has experience as a dance instructor, receptionist, restaurant hostess and server, and sales associate. Tr. 224–25. She alleges she became disabled in June 2006 from kidney problems, Crohn's disease, endometriosis, degenerative disc disease, depression, anxiety, sleep problems, panic attacks, gall bladder removal, acid reflux, a hiatal hernia, migraine headaches, TMJ, and vision loss. Tr. 223. She proceeded through the administrative process, failing at each level. Tr. 1–4, 14–36, 82–125, 128–39, 142–51. This case followed. Doc. 1.

## Evidence

This order adopts the summaries of evidence in the ALJ's decision, Tr. 23–29, and the parties' briefs, Doc. 15 at 17–25; Doc. 17 at 5–7, 11–13, 15–20, 22–24. Some evidence pertinent to the arguments is also summarized below.

In January 2013, Robert Steele, M.D., a state-agency consulting physician, evaluated Spivey-Adams's residual functional capacity ("RFC") and provided the following opinions. Tr. 118–19. In an 8-hour workday, she can occasionally lift and carry 20 pounds, frequently lift 10 pounds, stand or walk more than 6 hours, and sit more than 6 hours. Tr. 118. She can frequently climb ramps or stairs, balance, stoop, kneel, crouch, and crawl and occasionally climb ladders, ropes, or scaffolds. Tr. 119.

§§ 416.1466−416.1482. If the Appeals Council denies review, the claimant may file an action in federal district court. 20 C.F.R. § 416.1481.

The Commissioner substantially revised regulations on the consideration of medical evidence for claims filed on or after March 27, 2017. *See* 82 Fed. Reg. 5844-01, 5844 (Jan. 18, 2017). Because Spivey-Adams filed her claim before that date, all citations are to the regulations in effect on the date of the ALJ's decision.

She has no manipulative, visual, communicative, or environmental limitations. Tr. 119.

In December 2013, Dr. Parghi completed a physical RFC questionnaire. Tr. 790–92. He stated he had seen Spivey-Adams for more than 8 years; diagnosed her with neck pain, back pain, recurrent urinary tract infections, depression, and anxiety; opined her prognosis was fair; and identified "tenderness on [palpation] of lumbar and cervical spine" as the clinical findings and objective signs supporting his opinions. Tr. 790. He provided the following opinions on her functional limitations. During a typical workday, her pain or other symptoms will occasionally be severe enough to interfere with attention and concentration necessary to perform even simple work tasks. Tr. 790. She can walk one block without rest or severe pain, sit for one hour at a time before needing to get up, and stand for 45 minutes at a time before needing to sit down or walk around. Tr. 791. In an 8-hour workday, she can sit for 4 hours and stand or walk for less than 2 hours. Tr. 791. In an 8-hour workday, she would need unscheduled 15-minute breaks about every 2 hours. Tr. 791. She need not elevate her legs while sitting or use an assistive device while standing or walking. Tr. 791. She can frequently lift less than 10 pounds, occasionally lift 10 pounds, rarely lift 20 pounds, and never lift 50 pounds. Tr. 791. She does not have significant limitations in reaching, handling, or fingering. Tr. 792. In an 8-hour workday, she can grasp 75 percent of the time, perform fine manipulations 60 percent of the time, and reach 50 percent of the time with both hands. Tr. 792. Her impairments are likely to produce good days and bad days. Tr. 792. She is likely to be absent from work more than 4 days a month on average because of impairments or treatment. Tr. 792. She needs to lie down for about an hour during an 8-hour time period. Tr. 792.

In February 2014, a kinesiotherapist[4] completed a functional capacity evaluation that Dr. Hussain also signed. Tr. 819–21. The evaluator provided the

---

[4]Following the evaluator's name is the abbreviation "KT," which likely stands for "kinesiotherapist." *See* United Spinal Ass'n, *Alphabetical Listing of Medical Abbreviations*,

following opinions. Spivey-Adams cannot perform sedentary work. Tr. 819. She can lift and carry up to 6 pounds and can push and pull with up to 10 pounds of force. Tr. 820. She can lift and carry negligible weight occasionally but must avoid frequent or continuous lifting or carrying of any weight. Tr. 820. Those limitations arise from her back pain. Tr. 820. She can continuously reach; occasionally squat, kneel, crawl, and stoop; and must avoid bending, twisting, and climbing stairs and ladders. Tr. 820. Those limitations arise from her back and leg pain and need to avoid unprotected heights. Tr. 820. She can perform gross and fine movements with both hands and feet. Tr. 820. She can sit up to 1 minute at a time[5] and 3 to 4 hours in a day, stand or walk up to 30 minutes at a time and 2 to 3 hours in a day, walk 3 to 4 blocks, drive an automatic-transmission car up to 45 minutes at a time and 1 to 2 hours in a day, and must avoid driving a standard-transmission car. Tr. 820. The evaluator explained:

> Ms. Spievey-Adams indicated areas of pain to be the low back, with occasional radicular pain of the right lower extremity, internal abdomen, pelvis, and occasional migraines, with present moderate pain rating of 5. The lowest level of pain experienced in last 30 days is mild pain rating of 2, with use of medication, and minimizing or avoiding activities of daily living that result in aggravation, or increase of pain symptoms. She claims intense pain level of 8 as the highest level of pain experienced in the last 30 days with recent changes of medication, attempts to increase functional activities of daily living, or undetermined causes associated with onset of increase pain severity. The client appeared to demonstrate emotional content and focus to pain symptoms with moderate to intense pain ratings and testing of pain assessment questionnaires. Maximal and 5-position isometric hand grip test revealed bilateral hand grip weakness as compared to normal age group mean handgrip values, with limitations due to reported maximal efforts. Testing resulted in expected bell shaped curvature, and reproducibility of values with bilateral hand grip, suggestive of consistent effort. Functional testing revealed tolerance to negligible

---

*available at* http://www.spinalcord.org/resource-center/askus/index.php?pg=kb.page&id=1413 (last visited Sept. 25, 2017).

[5]"One minute" appears to be a typographical error. Though unclear, it is likely the evaluator intended to state Spivey-Adams can sit up to one hour at a time, not one minute.

levels of effort and repetitions of material and non-material handling activities, suggestive of limitations with ability to safely perform components of even the Sedentary Duty Physical Demand Level. She would also be limited with inability to participate with sustained or frequent basis, due to her poor tolerance to prolonged periods of sitting, standing and walking, from her claims of requiring intermittent supportive positional reclining, totaling 2–3 hrs., to assist with management of progressive elevation of pain symptoms throughout the day. She would also be limited due to reported 3–4 episodic pain flare-up a month resulting in 5–6 days a month of incapacitating pain severity. The client also indicated minimizing or avoiding driving due to pain and physical limitations.

Tr. 819 (errors in original). Under a section titled, "MUSCULOSKELETAL SCREEN (COMMENTS)," the evaluator stated:

A brief musculoskeletal evaluation was performed, with observation of functional mobility during testing for consistency of effort. Testing revealed [range-of-motion] limitations and guarded functional movements of the low back in all planes of movement, and inability to perform complete forward bending, due to her reported pain areas of the mid and low back.

Tr. 821.

In February 2014, Dr. Arcila completed a physical RFC questionnaire. Tr. 800. She stated she sees Spivey-Adams once a month; diagnosed her with lumbar disc displacement, lumbago, post-laminectomy syndrome, chronic pain syndrome, and Crohn's disease; and identified the functional capacity evaluation as the objective evidence supporting her opinions. Tr. 800. She provided the following opinions. During a typical workday, Spivey-Adams's pain or other symptoms will constantly be severe enough to interfere with attention and concentration necessary to perform even simple work tasks. Tr. 800. She can walk 3 to 4 blocks without rest or severe pain and stand for 30 minutes at a time before needing to sit down or walk around. Tr. 801. In an 8-hour workday, she can sit for 3 to 4 hours and stand or walk for 2 to 3 hours. Tr. 801. In an 8-hour workday, she would need unscheduled breaks consistent with the findings in the functional capacity evaluation. Tr. 801. She need

not elevate her legs while sitting or use an assistive device while standing or walking. Tr. 801. She can frequently lift less than 10 pounds but never more. Tr. 801. She has no significant limitations with reaching, handling, or fingering. Tr. 802. In an 8-hour workday, she has no limitations in grasping or performing fine manipulation and can reach 67 to 100 percent of the time with both hands. Tr. 802. Her impairments are likely to produce good days and bad days. Tr. 802. She is likely to be absent from work more than 4 days a month on average because of impairments or treatment. Tr. 802. She needs to lie down for 2 to 3 hours during an 8-hour time period. Tr. 802.

In August 2014, Dr. Hussain provided the following answers to interrogatories (he answered yes or no to most questions posed). Tr. 822–23. He has been treating Spivey-Adams since January 2014 for impairments including post-laminectomy syndrome, lumbar disc displacement, lumbosacral spondylosis, lumbago, and chronic pain syndrome. Tr. 822. He is familiar with and has access to the medical records from the Institute of Pain Management from before then. Tr. 822. He reviewed the February 2014 functional capacity evaluation and Dr. Arcila's physical RFC questionnaire, and the findings and opinions in them are consistent with treatment records from the Institute of Pain Management and his examination findings and accurately reflect Spivey-Adams's work capabilities. Tr. 822–23. Spivey-Adams's reports of significant pain limiting her ability to engage in prolonged sitting, standing, walking, or lifting and restricting her to part-time work and limited activities of daily living are consistent with her impairments, his examination results, and his clinical and objective findings. Tr. 823. Under "COMMENTS," he wrote:

> Pt has had anterior/posterior fusion of L4/SI in 2008, Bilateral urethral re-implantation 1990, chronic abdominal pain due to Crohn's disease/multiple ovarian endometriosis/scar adhesion surgeries (2000, 2007, 2009), chronic kidney disease w/ frequent UTI's, chronic lumbar facet arthropathy aggravation.

Tr. 823.

At a 2014 hearing, Spivey-Adams testified as follows.

She attended some college in 2005 or 2006. Tr. 43. Medical records indicating she attended college classes in late 2011 are wrong. Tr. 43–45, 62–63. She has tried looking for low-cost health care options but has found none she can afford. Tr. 45–46. She works as a server at a restaurant for 3- to 4-hour shifts about 4 days a week. Tr. 48–49. She frequently lifts up to 15 pounds. Tr. 49. She does not believe she can work full time because she has difficulty standing for more than 2 hours because of severe back pain. Tr. 49–50. The last time she worked full time (in 2004 or 2005), she got "very sick" after about two months and experienced pain and exhaustion. Tr. 50.

She sees a pain-management physician once a month, a primary-care doctor about once every three months, and recently returned to Dr. Arnold Graham Smith (a neurosurgeon) to have him review an MRI. Tr. 50, 64. He indicated the image was not clear enough for him to "see what he needed to see." Tr. 64. He suggested additional tests, but she did not pursue them because she has no insurance. Tr. 64. She last saw Dr. Smith several years earlier, when she had back surgery. Tr. 50–51, 63. The surgery did not resolve her back pain, so she continued to follow up with him to improve her back pain until she moved to pain management. Tr. 51, 68. She saw Dr. Arcila for a couple of years at the Institute of Pain Management, and Dr. Arcila "probably knows the most" about her conditions. Tr. 67. She recently began seeing Dr. Hussain because Dr. Arcila left. Tr. 67.

She takes Oxycodone and uses a Fentanyl patch, which she wears all the time and changes every 2 days. Tr. 64. She has been receiving medication through her pain-management doctor since before she underwent back surgery. Tr. 52. She is "kind of used to" most of the side effects because she has been taking medication for so long. Tr. 52. She also has received "different kinds of injections" in her back. Tr. 67–68.

She smokes less than half a pack of cigarettes a day. Tr. 53. She either "borrow[s] a couple [cigarettes] from people" or buys a pack whenever she has some extra money from work. Tr. 53–54.

She can lift at most 5 to 10 pounds frequently but would be in pain afterward. Tr. 54. She can sit for 30 to 45 minutes at a time and stand for about 2 hours at a time before needing to move around or take a break, but she would be in pain afterward. Tr. 54–55. She can walk 15 to 20 minutes a time before sitting down or taking a break. Tr. 55. She has difficulty using stairs. Tr. 55. Since using a walker during her recovery from back surgery, she has not been prescribed an assistive device for walking. Tr. 55. Besides back pain, she has Crohn's disease, experiences stomach cramps and nausea, and occasionally gets kidney stones. Tr. 66–67.

She lives alone in a one-story house that her mother owns. Tr. 55, 58. In a typical workday, she wakes up by 9:30 a.m., showers quickly, and gets dressed. Tr. 56. She leaves for work at about 10:15 a.m., arrives by 11:00 a.m., and begins working at about 11:30 a.m. Tr. 56. She can occasionally lean against a wall or sit down for short periods of time while at work. Tr. 66. She works until 2:30 or 3:00 p.m. Tr. 56. She then returns home and lies down for the rest of the day. Tr. 56. She feels "extremely" tired and sore after working. Tr. 65. She called in sick once after working a night shift longer than her usual shift, and she has been sent home twice because she was in a lot of pain, felt nauseous and exhausted, and "looked sickly." Tr. 65–66. On a nonwork day, she tries to "rest up and save [her] energy for when [she] ha[s] to work." Tr. 56. She does "small things around the house" throughout the day but usually returns to lying down or reclining. Tr. 56. She tries to do small chores such as sweeping a room or cleaning a few dishes and rest in between. Tr. 56–57.

She can dress and bathe herself. Tr. 57. She can prepare simple meals but cannot stand to cook for more than a couple of minutes. Tr. 57. She shops for groceries with help from others. Tr. 57. She typically gathers her laundry and drives to her mother's house, and her mother does the laundry for her. Tr. 57–58. If she is cannot finish dishes, she will have her mother or a friend come over to help. Tr. 58. She must call someone for maintenance issues around the house, and her mother hires people to do yard work. Tr. 58. She leaves the house for no more than a couple of hours to

get food or run errands. Tr. 59. She rarely does other activities with friends or family but will occasionally have someone over or go to someone's house to watch a movie. Tr. 59. She does not belong to a group or club. Tr. 59–60. She reads a lot and enjoys doing small crafts such as making bead bracelets or other small jewelry. Tr. 60.

She weighs 118 pounds but used to weigh 196 pounds about a year and a half ago. Tr. 60–61. She knows of no reason for the significant decrease but assumes it is mostly attributable to a healthier diet. Tr. 61–62. She saw her doctor about every month after she began losing weight, and he was unsure if it was attributable to Crohn's disease or something else. Tr. 61. Her weight continued to drop even after she stopped trying to lose weight. Tr. 61. She "[m]ostly" agrees with medical records indicating she had begun exercising more; she does some stretching and tries to walk her dog around her neighborhood. Tr. 61.

The ALJ asked a vocational expert ("VE") to consider a hypothetical person the same age as Spivey-Adams and with her education, work experience, and the following limitations:

> limited to work at the light exertional level, defined as lifting up to 20 pounds occasionally, lift, carry up to 10 pounds frequently. Standing walking [sic] for about six hours, and sitting for up to six hours in an eight hour work day with normal breaks. In addition, limited to … no climbing of ladders, ropes or scaffolds, occasional climbing of ramps or stairs, occasional balancing, occasional stooping, occasional kneeling, occasional crouching and occasional crawling. Also should avoid concentrated use of moving machinery, and avoid concentrated exposure to unprotected heights.

Tr. 71–22. The VE testified that person could perform Spivey-Adams's past work as a waitress and could also perform other jobs available in the national economy (cashier II, ticket seller, ticket taker). Tr. 72.

The ALJ asked the VE to consider a person with the same limitations as in the first hypothetical but with the following additional limitations:

> A sit-stand option defines [sic] allowing a person to sit or stand alternatively at-will. Provided this person within employer tolerances for off-task behavior. In addition, work is limited to simple, routine and repetitive tasks performed in a work environment, free of fast-paced production requirements, involving only simple work-related decisions, and routine workplace changes.

Tr. 73. The VE testified that person could not perform Spivey-Adams's past work but could perform other jobs available in the national economy (a reduced number of ticket-taker jobs and collator/operator). Tr. 73–74.

The ALJ asked the VE to consider a person with the same limitations as the second hypothetical but who was limited to sedentary work, "defined as lifting up to ten pounds occasional. Standing and walking for about two hours, and sitting for up to six hours in an eight hour work day with normal breaks." Tr. 74. The VE testified that person could perform jobs available in the national economy (addresser; cutter and paster, press clippings; waxer). Tr. 74–75.

The VE testified three or more unexcused or unscheduled absences or late arrivals "would be considered excessive and result in termination." Tr. 75. The VE testified typically the jobs identified allow for two 15-minute breaks and a 30-minute lunch break. Tr. 75. The VE testified an employee who was off-task for more than 10 percent of a workday "would be unable to sustain competitive employment." Tr. 76.

Spivey-Adams's counsel asked the VE to consider a hypothetical person the same age as Spivey-Adams and with her education and work experience who could "sit for a total of four hours in an eight hour day, … stand and walk for less than two hours," and "lift ten pounds occasionally and 20 pounds rarely." Tr. 78. The VE testified those limitations would "eliminate all work." Tr. 78. Counsel asked the VE to consider a hypothetical person who could "sit for three up to four hours in an eight hour day, … stand and walk for two to three hours," and "frequently lift up to nine pounds, but never more than nine pounds." Tr. 79. The VE testified those limitations would eliminate all work. Tr. 79.

# ALJ's Decision

At step one,[6] the ALJ found Spivey-Adams has not engaged in substantial gainful activity since June 30, 2006. Tr. 19.

At step two, the ALJ found Spivey-Adams suffers from severe impairments of degenerative disc disease status post-surgery, a history of Crohn's disease, irritable bowel syndrome, and post-laminectomy syndrome. Tr. 20.

At step three, the ALJ found Spivey-Adams has no impairment or combination of impairments that meets or medically equals the severity of any listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1. Tr. 21.

After stating she had considered the entire record, the ALJ found Spivey-Adams has the RFC to perform light work as defined in 20 C.F.R. § 416.967(b)[7] with additional limitations:

> [T]he claimant can lift up to 20 pounds occasionally, lift/carry up to 10 pounds frequently, the claimant can stand/walk for about 6 hours and sit for up to 6 hours in an 8-hour workday, with normal breaks; the claimant can occasionally climb ramps/stairs, balance, stoop, kneel, crouch, and crawl; the claimant must never climb ladders, ropes, or

---

[6]The Social Security Administration uses a five-step sequential process to decide if a person is disabled, asking whether (1) she is engaged in substantial gainful activity, (2) she has a severe impairment or combination of impairments, (3) the impairment meets or equals the severity of anything in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, App'x 1, (4) she can perform any of her past relevant work given her RFC, and (5) there are a significant number of jobs in the national economy she can perform given her RFC, age, education, and work experience. 20 C.F.R. § 416.920(a)(4). "Past relevant work is work [a claimant has] done within the past 15 years, that was substantial gainful activity, and that lasted long enough … to learn to do it." 20 C.F.R. § 416.960.

[7]"Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. " 20 C.F.R. § 416.967(b).

scaffolds; the claimant must avoid concentrated use of moving machinery and exposure to unprotected heights.

Tr. 21.

The ALJ discussed Spivey-Adams's activities of daily living:

[T]he claimant engages in a variety of activities of daily living that one would not expect from an individual alleging to be disabled. January 2011 progress notes document that the claimant has been currently attending college. November 2011 progress notes document that the claimant was currently attending college. While the claimant testified that she is not attending college, progress notes are very clear in reporting that she was attending college at the time. However, the claimant disputed these treatment records at the hearing (Exhibit 9F/44–54). The claimant has also successfully lost a lot of weight through diet and exercise while seeing someone who likes to exercise more, and was instructed to continue her weight loss (Exhibit 16F/5, 10). She testified she was previously 196 pounds, and is currently 118 pounds. July 2013 through August 2013 progress notes from Dr. Arcila reveal that the claimant was actively losing weight and weighed 160 pounds, losing 20 pounds since her prior visits (Exhibit 17F). The claimant also drives, visits with friends, and lives independently. Also during the relevant period, the record reveals that she has worked after her alleged onset date. She has worked for GameStop, and currently works for Ale House as a server, although both of these positions have been below [substantial-gainful-activity] levels. Nevertheless, the claimant's ability to work and engage in the activities described in treatment records since the alleged onset date suggests a greater level of functioning than has been alleged.

Tr. 26.

The ALJ gave little weight to Dr. Parghi's opinions, explaining:

Dr. Parghi's opined severity is inconsistent with Dr. P[ar]ghi's treatment records and the claimant's noted activities of daily living and work history. Progress notes from January 2013 through October 2013 reveal that the claimant's gait was normal. The claimant's muscle strength was normal and she demonstrated full range of motion (Exhibit 17F). April 2014 progress notes from Dr. Parghi revealed only mild joint tenderness (Exhibit 22F). Dr. Parghi's own notes reveal that the claimant was neurologically intact, and her mood was within normal

limits. She was seen only to be mildly depressed. Her memory was intact for recent and remote events. The claimant was also noted to have a recurrence of headaches, which were controlled with Fiorcet (Exhibit 10F). Progress notes through August 2013 document that the claimant was engaged in an exercise program and had lost weight. Exam notes documented only positive paraspinal spasm and vertebral tenderness (Exhibit 16F). Dr. Smith's findings approximately one month prior to the hearing were also essentially unremarkable except for probable right chronic sacroili[i]tis after prior surgery in 2009. However, the claimant has been noted as stable on her medication regimen, and has declined lumbar injections that were offered in the past (Exhibit 17F/30), which further suggests satisfactory management of symptoms with her current treatment regimen. Thus, the evidence does not support Dr. Parghi's opinion.

Tr. 27. She gave little weight to Dr. Hussain's opinions, explaining "the opined severity is also inconsistent with the objective evidence of record, treatment notes[,] and activities of daily living since the alleged onset date." Tr. 27. She relied on the same evidence discussed in evaluating Dr. Parghi's opinions and added:

Regarding the claimant's Crohn's and IBS, a 2010 colonoscopy was normal. During a June 2010 follow-up, the claimant indicated that she had been doing well and her bowel habits were normal (Exhibit 15F). An October 2011 CT of the abdomen was normal (Exhibit 5F). January 2012 progress notes reveal that the claimant was not having frequent flare-ups of Crohn's disease and had been having less diarrhea. The claimant indicated that her medications were helping to control her pain and that she was able to function without difficulty (Exhibit 9F). April 2014 progress notes document that she was doing well. Urinalysis screenings were negative for urinary tract infections (Exhibit 22F). Thus, the overall record does not establish that the claimant is precluded from all full-time work at [substantial-gainful-activity] levels. Moreover, Dr. Huss[a]in's opinion also appears largely based upon the claimant's subjective complaints and reports, which have not been found to be fully consistent with objective findings, activities of daily living[,] or treatment records as discussed herein.

Tr. 27–28. She gave little weight to Dr. Arcila's opinions, again relying on progress notes from January through October 2013 showing "essentially unremarkable" examination findings and Spivey-Adams's decision to decline lumbar injections. Tr. 28. She added:

Dr. Arcila's assessment is not consistent with her own treatment notes, the claimant's activities of daily living[,] and [her] work history. Progress notes from November 2011 through August 2012 document mild lumbar tenderness. The claimant's gait and station were normal and without abnormalities. Dr. Arcila's medication regimen included Oxycodone, which is noted to have moderately reduced her pain (Exhibit 9F). … January 2012 progress notes from Dr. Arcila reveal that the claimant was not having frequent flare-ups of Crohn's disease and had been having less diarrhea. The claimant indicated that her medications have been helping to control her pain and that she was able to function without difficulty (Exhibit 9F). Such findings, as well as those discussed in prior paragraphs above herein, do not support the opined severity of Dr. Arcila's opinions regarding work[-]preclusive limitations.

Tr. 28. She gave substantial weight to Dr. Steele's opinions because she found them "generally consistent with the overall evidence discussed" in the decision. Tr. 29. She explained she included additional or more restrictive limitations than Dr. Steele found "in an abundance of caution" to address Spivey-Adams's "pain complaints and fatigue complaints, noting her narcotic pain regimen." Tr. 29.

At step four, the ALJ found Spivey-Adams can perform her past relevant work as a waitress. Tr. 29–30. Alternatively, at step five, the ALJ found Spivey-Adams can perform jobs the VE identified (cashier II, ticket seller, and ticket taker) and those jobs exist in significant numbers in the national economy. Tr. 30–31. She therefore found no disability. Tr. 31.

## Standard of Review

A court's review of an ALJ's decision is limited to determining whether the ALJ applied the correct legal standards and whether substantial evidence supports his findings. *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005). Substantial evidence is "less than a preponderance"; it is "such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Id.* A court may not decide facts anew, reweigh evidence, make credibility determinations, or substitute its judgment for the Commissioner's judgment. *Id.* A court must affirm the ALJ's

decision if substantial evidence supports it, even if the evidence preponderates against the factual findings. *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990).

## Law & Analysis

Spivey-Adams argues substantial evidence does not support the ALJ's decision to give little weight to her treating physicians' opinions because (1) the ALJ did not discuss all factors relevant to evaluation of medical opinions, (2) substantial evidence does not support the finding that the opinions are inconsistent with other medical evidence, (3) substantial evidence does not support the finding that the opinions are inconsistent with her reported activities of daily living and work history, and (4) substantial evidence does not support the finding that Dr. Hussain based his opinions primarily on her subjective complaints. Doc. 15 at 9–17. She argues the ALJ inadequately discussed Dr. Hussain's opinions, giving them at most "cursory" treatment. Doc. 15 at 11. And she argues that, in rejecting her treating physicians' opinions, the ALJ improperly substituted her lay opinions for those of medical experts. Doc. 15 at 17.

The Commissioner responds: (1) Spivey-Adams's arguments are contrary to the standard of review because she points to evidence supporting her claims without acknowledging substantial evidence supports the ALJ's findings; (2) the ALJ considered all factors in evaluating the opinions and was not required to expressly discuss each; (3) substantial evidence supports the findings that the opinions were inconsistent with other medical evidence and Spivey-Adams's activities and were based largely on subjective complaints; (4) the ALJ was not required to compare medical opinions or find a claimant disabled based on the number of consistent medical opinions; (5) the ALJ adequately discussed Dr. Hussain's opinions; (6) the state-agency medical consultants' opinions support the ALJ's decision; and (7) substantial evidence supports the ALJ's evaluation of Spivey-Adams's subjective complaints. Doc. 17 at 4–27.

To be eligible for benefits, a claimant must demonstrate she is disabled. 20 C.F.R. § 416.912(a). A claimant is disabled if "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). The claimant has the burden of persuasion through step four. *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987).

In making a disability determination, an ALJ must consider all relevant record evidence. 20 C.F.R. § 416.920(a)(3). "[T]here is no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision, so long as the ALJ's decision … is not a broad rejection which is not enough to enable [the Court] to conclude that [the ALJ] considered [the claimant's] medical condition as a whole." *Dyer v. Barnhart*, 395 F.3d 1206, 1211 (11th Cir. 2005) (internal quotation marks omitted). "[T]he burden of showing that an error is harmful normally falls upon the party attacking the agency's determination." *Shinseki v. Sanders*, 556 U.S. 396, 409 (2009).

A claimant's RFC is the most she can still do despite her limitations. 20 C.F.R. § 416.945(a)(1). The Social Security Administration uses the RFC at step four to decide if she can perform any past relevant work and, if not, at step five with other factors to decide if there are other jobs in significant numbers in the national economy she can perform. 20 C.F.R. § 416.945(a)(5). The "mere existence" of an impairment does not reveal its effect on a claimant's ability to work or undermine RFC findings. *Moore v. Barnhart*, 405 F.3d 1208, 1213 n.6 (11th Cir. 2005).

Regardless of its source, the Social Security Administration "will evaluate every medical opinion" it receives. 20 C.F.R. § 416.927(c). "Medical opinions are statements from acceptable medical sources that reflect judgments about the nature and severity of … impairment(s), including … symptoms, diagnosis and prognosis, what [one] can still do despite impairment(s), and … physical or mental restrictions.

20 C.F.R. § 416.927(a). Opinions on issues that are dispositive of a case, such as whether a claimant is disabled or able to work, are not medical opinions because they are opinions on issues reserved to the Commissioner. 20 C.F.R. § 416.927(d)(1).

An ALJ "must state with particularity the weight given to different medical opinions and the reasons therefor." *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1179 (11th Cir. 2011). "In the absence of such a statement, it is impossible for a reviewing court to determine whether the ultimate decision on the merits of a claim is rational and supported by substantial evidence." *Id.* "Unless [an ALJ] has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." *Cowart v. Schweiker*, 662 F.2d 731, 735 (11th Cir. 1981) (internal quotation marks omitted). If an ALJ does not "state with at least some measure of clarity the grounds for his decision," a court will not affirm simply because some rationale might have supported it. *Winschel*, 631 F.3d at 1179.

The Social Security Administration generally will give more weight to the medical opinions of treating sources[8] because they "are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairment and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations." 20 C.F.R. § 416.927(c)(2). An ALJ need not give more weight to a treating source's opinion if there is good cause to do otherwise and

---

[8]A treating source is a physician, psychologist, or other acceptable medical source who provides medical treatment or evaluation to the claimant and who has, or has had, an ongoing treatment relationship with the claimant, as established by medical evidence showing that the claimant sees or has seen the physician with a frequency consistent with accepted medical practice for the treatment or evaluation required for the medical condition. 20 C.F.R. § 416.902.

substantial evidence supports the good cause. *Phillips v. Barnhart*, 357 F.3d 1232, 1240 (11th Cir. 2004). Good cause exists if the evidence does not bolster the opinion, the evidence supports a contrary finding, or the opinion is conclusory or inconsistent with the treating source's own medical records. *Id.* at 1240−41.

To be entitled to controlling weight, a treating source's medical opinion must be "well-supported by medically acceptable clinical and laboratory diagnostic techniques and … not inconsistent with the other substantial evidence in your case record. 20 C.F.R. § 416.927(c)(2). The term "not inconsistent" means

> a well-supported treating medical source opinion need not be supported directly by all of the other evidence (i.e., it does not have to be consistent with all the other evidence) as long as there is no other substantial evidence in the case record that contradicts or conflicts with the opinion.

Social Security Ruling ("SSR") 96-2p, 1996 WL 374188 (July 2, 1996).[9]

Unless the Social Security Administration gives a treating source's opinion controlling weight, it will consider several factors to decide the weight to give a medical opinion: examining relationship, treatment relationship, supportability, consistency, specialization, and any other relevant factor. 20 C.F.R. § 416.927(c). An ALJ need not explicitly address each factor. *Lawton v. Comm'r of Soc. Sec.*, 431 F. App'x 830, 833 (11th Cir. 2011). Some factors, like the treatment relationship, may "sometimes take precedence over other factors, but at other times will not." POMS DI 24515.003(B).

When a claim is before an ALJ, the ALJ assesses a claimant's RFC. 20 C.F.R. § 416.946(c). She need not defer to any medical opinion concerning a claimant's RFC. *See* 20 C.F.R. § 416.927(d)(3). An ALJ does not "play doctor" when evaluating a

---

[9]In light of the amendments to the regulations effective March 27, 2017, the Social Security Administration rescinded SSR 96-2p as inconsistent with the revised regulations. *See* Rescission of Social Security Rulings 96-2P, 96-5P, and 06-3P, 2017 WL 3928298 (Mar. 27, 2017). Because the revised regulations do not apply here, SSR 96-2p is relevant.

claimant's RFC, *Castle v. Colvin*, 557 F. App'x 849, 853–54 (11th Cir. 2014), even absent a medical opinion concerning the claimant's limitations, *cf. Green v. Soc. Sec. Admin.*, 223 F. App'x 915, 923–24 (11th Cir. 2007) (finding substantial evidence supported ALJ's RFC finding even after he discredited only medical evaluation in record because he relied on office visit records).

Spivey-Adams contends the ALJ failed to consider several factors relevant in evaluating medical opinions, including their consistency with each other and other medical evidence, the nature and length of the treating and examining relationships of the doctors, and their areas of specialization. Doc. 15 at 9–11. Though the ALJ had to consider those factors, she was not required to explicitly address all of them in her decision. *See Lawton*, 431 F. App'x at 833. Her decision demonstrates she knew and considered that Drs. Parghi, Arcila, and Hussain were Spivey-Adams's treating physicians who had examined her on several occasions.[10] *See* Tr. 24, 27 (discussing treatment notes from those doctors). Part of her rationale for giving the opinions little weight was their inconsistency with the doctors' own treatment notes. *See* Tr. 27–28. As for consistency with other evidence, the ALJ's discussion of the opinion evidence indicates she knew of the consistency among the three doctors' opinions; she discussed them back-to-back, they opined Spivey-Adams has similar debilitating limitations, and she rejected them for nearly identical reasons.[11] *See* Tr. 27–28. She

---

[10]Spivey-Adams appears to argue the regulations required the ALJ to give significant weight to the doctors' opinions because she identified no evidence supporting a finding that they lacked "reasonable knowledge" of Spivey-Adams's impairments. Doc. 15 at 10. The regulation she cites states only that the Social Security Administration will give more weight to an opinion from a treating source with reasonable knowledge of the impairments than it would if the opinion "were from a nontreating source." *See* 20 C.F.R. § 416.927(c)(ii) (quoted). That does not mean an ALJ must give significant weight to an opinion from such a treating source even if other factors warrant giving it less weight. That Drs. Parghi, Arcila, and Hussain had reasonable knowledge of Spivey-Adams's impairments does not undermine the ALJ's finding that the inconsistency of their opinions with other evidence provided good cause to give their opinions little weight. *See Phillips*, 357 F.3d at 1240.

[11]Though the opinions of Drs. Parghi, Arcila, and Hussain are generally consistent in that they all include disabling functional limitations, they are not identical and, in some ways, are significantly different. Dr. Parghi opined Spivey-Adams's pain or other symptoms

also mentioned Dr. Hussain's agreement with the other opinions. Tr. 27. The consistency of those opinions alone is insufficient to warrant giving them greater weight. The ALJ also considered and explicitly addressed the opinions' inconsistency with other medical evidence. As for specialization, Spivey-Adams points to no record clearly identifying any of the doctors as specialists in a relevant field, instead relying on outside information. *See* Doc. 15 at 4 n.2, 5 n.3, 6 n.4. In any event, she does not explain why their specializations are significant or would affect the reasons the ALJ gave for rejecting the opinions.

Substantial evidence supports the ALJ's finding that the opinions are inconsistent with treatment records. As the ALJ observed, several records—including a significant number of treatment records from Drs. Parghi and Arcila—show normal gait and station, normal range of motion, full strength, other mild or normal examination findings and diagnostic imaging, reports that Spivey-Adams's pain medication was at least moderately effective, or less frequent flare-ups of Crohn's disease. Tr. 438–39, 638–41, 644–47, 649–52, 654–57, 660–63, 665–68, 670–73, 675–78, 682, 685–88, 690–93, 695–96, 698–99, 702–04, 706–08, 729, 733–34, 736–37, 739–40, 742–43, 745–46, 748–49, 754, 759, 764–65, 770, 775–76, 778, 783, 789. Records also show Spivey-Adams reported she lost weight through exercise, reported

---

would occasionally be severe enough to interfere with attention and concentration necessary to perform simple work tasks in an 8-hour workday, Tr. 790; Drs. Arcila and Hussain opined her symptoms would constantly be that severe, Tr. 800, 823. Dr. Parghi opined Spivey-Adams can walk 1 block without rest or severe pain, Tr. 791; Drs. Arcila and Hussain opined she can walk 3 to 4 blocks, Tr. 801, 820, 823. Dr. Parghi opined Spivey-Adams can frequently lift less than 10 pounds, occasionally lift 10 pounds, and rarely lift 20 pounds, Tr. 791; Dr. Arcila opined she can frequently lift less than 10 pounds but never lift 10 or more pounds, Tr. 801; through his endorsement of the functional capacity evaluation, Dr. Hussain opined she can lift and carry a maximum of 6 pounds, occasionally lift and carry negligible weight, and never frequently or continuously lift any weight, Tr. 820; and, through his agreement with Dr. Arcila's opinions, Dr. Hussain also inconsistently adopted the weight limitations she found, Tr. 823. Dr. Parghi opined Spivey-Adams needs to lie down for no more than an hour during an 8-hour time period, Tr. 792; Drs. Arcila and Hussain opined she needs to lie down for about 2 to 3 hours, Tr. 802, 820, 823.

functioning without difficulty, and declined steroid injections despite being offered them. Tr. 675, 733, 736, 742, 754, 764–65, 770, 775, 777, 789.

Citing SSR 96-2p, Spivey-Adams argues that "[t]o find that a medical opinion is 'consistent' with the record does not require the utter absence of *any* inconsistency." Doc. 15 at 11–12 (emphasis in original). And she points to other records showing decreased range of motion, reports of pain and other symptoms and descriptions of the quality of pain, continued treatment for pain, and at least one record purportedly showing she requested and received steroid injections. Doc. 15 at 13–14. Though SSR 96-2p states a medical opinion need not be consistent with all other evidence, it also says this is true only "as long as there is no other substantial evidence in the case record that contradicts or conflicts with the opinion." SSR 96-2p at *3. Multiple normal or mild examination findings over an extended time and Spivey-Adams's activities conflict with the doctors' opinions finding disabling limitations. Spivey-Adams's reliance on other records with different findings[12] is unavailing; because substantial evidence supports the ALJ's finding, the Court cannot reverse the ALJ's decision even if contrary evidence outweighs the evidence the ALJ relied on. *See Martin*, 894 F.2d at 1529 ("Even if the evidence preponderates against the … factual findings, we must affirm if the decision reached is supported by substantial evidence."). The ALJ did not "selective[ly] read[]" the evidence as Spivey-Adams contends, *see* Doc. 15 at 16; the decision clarifies she knew of and considered other evidence supporting Spivey-Adams's statements. But, in weighing the doctors' opinions, she may rely on evidence showing long periods of little supporting objective evidence.

---

[12]Spivey-Adams asserts she "did in fact request and receive [lumbar steroid] injections in October 2013 due to extreme pain." Doc. 15 at 14 (citing Tr. 784). The page she cites contains no indication she received lumbar injections; it states, "She wants to wait to do injections on her back still." Tr. 784. The remainder of the notes from that office visit also do not indicate she received injections. Under, "Plan," Dr. Arcila noted, "Lumbar Injections offered in past but patient declined. Will decide after MRI review to proceed." Tr. 789. And she noted, "TPI [trigger point injections] next month to low back if needed." Tr. 789.

Substantial evidence supports the ALJ's finding that the doctors' opinions were inconsistent with Spivey-Adams's daily activities and work history. The ALJ observed, and the record supports, that Spivey-Adams reported attending college, worked part-time as a server, lived independently, lost weight through exercise, and visited friends. Tr. 48–49, 237–41, 676, 681, 686, 691, 733, 736, 742. Those activities suggest a greater level of functioning than her doctors found.

Spivey-Adams argues her activities and work history are limited and are insufficient to show she can work full-time or overcome medical evidence supporting disability. Doc. 15 at 14–16. The ALJ found Spivey-Adams's subjective complaints not entirely credible, and Spivey-Adams does not challenge that finding. *See generally* Doc. 15. In any event, Spivey-Adams's activities are not "sporadic or transitory" as she contends, *see* Doc. 15 at 15, and the ALJ properly found that participation in a variety of activities is inconsistent with medical opinions that Spivey-Adams is incapable of any level of sustained physical activity.

Substantial evidence supports the ALJ's finding that Dr. Hussain's opinions were based primarily on Spivey-Adams's subjective complaints. The functional capacity evaluation, though mentioning some "limited" functional testing, includes virtually no test results aside from grip-strength testing. *See* Tr. 819–21. Without those, it is impossible to assess the opinions against those findings or determine whether his opinions were based on testing. *See* 20 C.F.R. § 416.927(c)(3) ("The more a medical source presents relevant evidence to support a medical opinion, particularly medical signs and laboratory findings, the more weight we will give that medical opinion. The better an explanation a source provides for a medical opinion, the more weight we will give that medical opinion."). The evaluation primarily references her subjective reports and does not indicate which limitations, if any, are based on objective functional testing. *See* Tr. 819–21. Though Dr. Hussain later indicated through interrogatory answers that the limitations were consistent with his treatment and examination of Spivey-Adams, *see* Tr. 822–23, he provides no specific

information. Spivey-Adams points to no treatment records from Dr. Hussain to support his opinions. Though Dr. Hussain stated he reviewed other treatment records from the Institute of Pain Management, as the ALJ observes, they also do not support the extreme limitations reflected in the functional capacity evaluation.

Spivey-Adams argues it is improper for an ALJ to reject a medical opinion as based on subjective complaints where there is nothing suggesting the doctor relied more on subjective complaints than on objective findings. Doc. 15 at 16. Unlike the cases she cites, here there is evidence suggesting Dr. Hussain and the examiner who completed the functional capacity evaluation relied more on subjective complaints. As discussed, the evaluation contains virtually no objective findings and repeatedly references Spivey-Adams's subjective reports of pain.

Spivey-Adams contends the ALJ's discussion of the functional capacity evaluation was "utterly abysmal," asserting the ALJ "only briefly noted it in a parenthetical with reference to its exhibit number … without reference to the specific limitations found upon examination." Doc. 15 at 11. Contrary to that assertion, the ALJ specifically referenced the evaluation and the interrogatory answers and described their content in some detail. Tr. 27. On the functional limitations in the evaluation, she observed:

> Dr. Huss[a]in opines that the claimant is limited to less than sedentary work, except lifting no more than 5 pounds negligibly, avoiding bending, twisting, climbing stairs and ladders, occasionally squatting, kneeling, crawling, and stooping, and continuously reaching. Dr. Hussain opined that the claimant would miss up to five to eight days of work.

Tr. 27. The ALJ's discussion of those documents demonstrates she adequately considered them. She was not required to list every detail in her decision. *Cf. Dyer, 395 F.3d at 1211* ("[T]here is no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision, so long as the ALJ's decision … is not a broad rejection which is not enough to enable [the Court] to conclude that [the ALJ] considered [the claimant's] medical condition as a whole.").

Finally, the ALJ did not impermissibly substitute her own lay opinion for those of medical experts. Instead, she fulfilled her duty under the regulations to assess Spivey-Adams's RFC in light of all the evidence in the record. She provided good reasons supported by substantial evidence for giving little weight to Spivey-Adams's treating physicians' opinions.

## Conclusion

The Court **affirms** the Acting Commissioner's decision and **directs** the clerk to enter judgment in favor of the Acting Commissioner and close the file.

**Ordered** in Jacksonville, Florida, on September 28, 2017.

PATRICIA D. BARKSDALE
*United States Magistrate Judge*

c:     Counsel of Record